Ernest WYMAN, et al., Plaintiffs,

v.

**PRIME DISCOUNT SECURITIES**
and Robert Rice, Defendants.

Civ. No. 92–228–P–C.

United States District Court,
D. Maine.

April 7, 1993.

William D. Robitzek, Tyler N. Kolle, Berman & Simmons, Lewiston, ME, for plaintiffs.

Harold J. Friedman, Laurence H. Leavitt, Friedman & Babcock, Portland, ME, for defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

In this case, Plaintiffs Ernest Wyman and Wilma Wyman allege securities fraud and seek monetary reparations for their economic injuries. The six-count action involves the following federal and pendent state law claims: Count I (violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5); Count II (negligence); Count III (breach of fiduciary duty); Count IV (fraud and deceit); Count V (violation of 32 M.R.S.A. § 10201); and Count VI (violation of Maine's Unfair Trade Practices Act, 5 M.R.S.A. § 205–A et seq.).

Defendants have filed a Motion for Partial Summary Judgment and Motion to Dismiss (Docket No. 32) supported by a Memorandum (Docket No. 33) and Statement of Material Facts Not in Dispute (Docket No. 34). Plaintiffs have filed an Opposition to Defendants' Motion for Partial Summary Judgment and Motion to Dismiss (Docket No. 42) supported by a Statement of Undisputed Material Facts (Docket No. 43). In addition, Plaintiffs have filed a Motion for Attachment/Trustee Process (Docket No. 26) with supporting Memorandum (Docket No. 27) and affidavits (Docket Nos. 28–30) to which Defendants have submitted their opposition (Docket No. 48) with supporting Memorandum (Docket No. 49) and affidavit (Docket No. 50).

This Court will first address Defendants' Motion for Partial Summary Judgment and Motion to Dismiss. The analysis of Plaintiffs' Motion for Attachment will follow.

### FACTS [1]

Plaintiffs have maintained securities investment accounts with Defendant Prime Discount Securities, Inc. ("Prime Discount") since 1985. Defendant Robert Rice acted as broker for Plaintiffs in all of their Prime Discount transactions.[2] Plaintiffs allege that, in 1988, Robert Rice began calling Plaintiffs and suggesting various high-risk stock purchases to them. Plaintiffs allegedly followed all of Defendants' suggestions, buying highly speculative stock, often in new companies, from 1989 to 1991.

---

1. Because of the number of genuine issues of material fact that are in dispute between the parties, the Court cannot draft its usual set of undisputed facts. Rather, the Court relies on Plaintiffs' allegations in order to provide the necessary factual background for the ensuing legal analysis.

2. Robert Rice is the only individual broker with whom Plaintiffs allege they dealt at Prime Discount. Ernest Wyman's Affidavit (Docket No. 46), ¶ 2; Wilma Wyman's Affidavit (Docket No. 45), ¶ 2.

Allegedly, many of the companies in which Plaintiffs bought stock did not succeed. Thus, Plaintiffs suffered financial loss. Ernest Wyman's portfolio went from a high of $117,665.61 in April 1989 to $11,254 in February 1993, while Wilma Wyman's portfolio shrunk from a high of $246,063.14 in November 1988 to $41,196 in February 1993. Plaintiffs seek to recover for their economic loss, alleging that Defendants recommended high-risk investments to them, despite their allegedly communicated conservative investment goals.

The parties seriously dispute various genuine issues of material fact, including, *inter alia*: 1) whether Plaintiffs made Defendants aware that they were only interested in conservative investment opportunities (*See* Ernest Wyman's Affidavit (Docket No. 46), ¶ 3; Ernest Wyman's Deposition at 21–22; Wilma Wyman's Affidavit (Docket No. 45), ¶ 4; Robert Rice's Affidavit (Docket No. 50), ¶ 4); 2) Ernest Wyman's knowledge regarding the workings and risks of stock trading (*See* Ernest Wyman's Deposition at 16–19, 22–23, and 27–28; Robert Rice's Affidavit (Docket No. 50), ¶ 2); and 3) the extent to which, if any, Ernest Wyman advised Ms. Wyman regarding her trading (*See also* Ernest Wyman's Deposition at 14–16; Wilma Wyman's Deposition at 13, 16–17; Wilma Wyman's Affidavit (Docket No. 45), ¶ 16; Robert Rice's Affidavit (Docket No. 50), ¶ 3).

## ANALYSIS

### I. MOTION TO DISMISS

#### PLEADING WITH SPECIFICITY UNDER FED.R.CIV.P. 9(b)

In their Motion for Partial Summary Judgment and Motion to Dismiss, Defendants argue that Plaintiffs' Amended Complaint fails to allege fraud with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). Thus, Defendants assert, Counts I, IV, V, and VI should be dismissed, without which the remaining pendent state-law claims would lack the necessary subject

matter jurisdiction to remain in federal court. In deciding this motion, the Court must accept the factual allegations set forth in the Amended Complaint as true and must draw all reasonable inferences in favor of Plaintiffs. *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989). Further, the Complaint should not be dismissed unless it appears beyond doubt that Plaintiffs can prove no set of facts which would entitled them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Dartmouth Review*, 889 F.2d at 16. In light of this standard, the Court examines the fraud claims against Defendants.

Pleading under the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under Federal Rule of Civil Procedure 9(b), however, a complainant alleging fraud must allege the circumstances constituting the fraud with specificity.[3] The purpose of Rule 9(b) is to: "1) place the defendants on notice and enable them to prepare meaningful responses; 2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit;' and (3) to safeguard defendants from frivolous charges which might damage their reputations." *Bailey v. Linsco/Private Ledger Corp.*, 136 F.R.D. 11, 13 (D.Me.1991) (quoting *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987)).

The Court of Appeals for the First Circuit, as well as this Court, has insisted on strict compliance with Rule 9(b). *See, e.g., Cutler v. F.D.I.C.*, 781 F.Supp. 816, 818 (D.Me.1992); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991); *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir.1987); *Bailey v. Linsco/Private Ledger Corp.*, 136 F.R.D. 11, 13 (D.Me.1991); *In re One Bancorp Securities Litigation*, 135 F.R.D. 9, 12 (D.Me.1991). Rule 9(b)'s particularity requirement also applies to private causes of action based on

---

3. Federal Rule of Civil Procedure 9(b) provides: In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Section 10(b) and Rule 10b–5, such as this one, because "fraud lies at the core of the action." *In re One Bancorp*, 135 F.R.D. at 12 (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985)).

To meet the specificity requirements demanded under Rule 9(b), a complainant alleging fraud must specify "the time, place and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *Wayne Investment, Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1st Cir.1984) (quoting *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980)). As the Court of Appeals for the First Circuit explained:

> The inquiry, however, does not end with [the] technical compliance [of specifying the time, place and content of an alleged misrepresentation]. The circumstances of the misrepresentation must be specified; the specific basis for the claim must be alleged.... (citations omitted). A complaint must do more than offer speculation, it must make some step toward showing that 'fraud was actually committed.'

*Haft v. Eastland Financial Corp.*, 755 F.Supp. 1123, 1127 (D.R.I.1991) (quoting *Wayne Investment*, 739 F.2d at 14).

■ The Amended Complaint at issue here alleges that:

9. Beginning [at the end of 1988] and continuing through November 1991, Defendants made representations to Plaintiffs and solicited Plaintiffs to purchase and sell securities through Defendants. At the time Plaintiffs' securities accounts were opened, Defendants knew Plaintiffs lacked sufficient investment experience and financial acumen to enable Plaintiffs to make any informed judgments or decisions about the purchase and sale of the securities recommended by Defendants.[4]

10. At the time Plaintiffs' securities accounts were opened, Defendants knew that Plaintiffs were retired with limited incomes and assets. The Plaintiffs advised Defendants that they were interested in conservative investments that would yield dividend income to supplement their social security income and other limited income. The Defendants knew that Plaintiffs were relying on their expertise in selecting appropriate securities to accomplish their investment objectives.

The Amended Complaint further asserts that immediately prior to each of the purchases and sales made by Defendants on behalf of each Plaintiff, Robert Rice contacted each Plaintiff at home by telephone, from either his office or home, in order to advise them that the stock was appropriately suited to Plaintiffs' financial objectives. Amended Complaint, ¶¶ 12–14.

From the Amended Complaint, as written, the particulars of the fraud allegations are these:

> *time*: from 1988 through 1991, immediately prior to any purchase or sale made by Defendants on behalf of Plaintiffs
>
> *place*: while Plaintiffs were in their homes and Defendant Rice was at his home or office
>
> *content*: Defendants knowingly made untrue statements of material facts to Plaintiffs regarding which securities were most appropriate for them (in light of the conservative investment objectives they communicated to him) with the purpose of inducing them to buy/sell certain securities[5]

4. Counsel has represented to the Court that "subsequent to filing the Amended Complaint, the Plaintiffs have made clear that they are claiming that unsuitable investment recommendations were made only from the end of 1988 through 1991." Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment (Docket No. 42) at 8 n. 1.

5. In the Amended Complaint, Plaintiffs contend that Defendants materially misrepresented to Plaintiffs that they would not charge commission on most purchases and sales made on behalf of Plaintiffs. Amended Complaint, ¶ 11. Such claims are deemed waived under Local Rule 19(b)(2), however, because Plaintiffs did not contest statements that "Ernest Wyman paid no commission with respect to any security which he alleges was fraudulently represented to him by Defendant Robert Rice" and "Plaintiff understood that Defendant Rice would charge a commission with respect to certain securities" made in Defendants' Statement of Material Facts Not in Dispute. *See* Defendants' Statement of Material Facts Not in Dispute (Docket No. 34), ¶¶ 8 and 24 and Plaintiffs' Statement of Material Facts (Docket No. 43).

Taking material allegations as true for the purposes of this motion, this Court finds that Plaintiffs have adequately specified in the Amended Complaint the time, place and content of the alleged fraud. Plaintiffs have alleged that Defendants repeatedly, from 1988–1991, knowingly encouraged Plaintiffs to buy securities that were very high risk, in direct contrast to the conservative investments Plaintiffs allegedly requested. Further, Plaintiffs have furnished Defendants with adequate notice of claims against them and the circumstances from which they arise. It is clear from Plaintiff's Amended Complaint that Plaintiffs are challenging all of the high-risk stock purchases made by Plaintiffs between 1988 and 1991. Thus, the circumstances of the misrepresentation have been specified and a specific basis for the fraud claims has been alleged.

The Court notes that Defendants asserted their Rule 9(b) motion *after* having substantially completed discovery and *after* both parties, as well as this Court, have spent time and energy on what Defendants now argue is an improperly pleaded complaint. Defendants' have never argued that they had difficulty preparing an adequate response to Plaintiffs' Complaint as pleaded. It is well settled that a pleading's allegation of fraud is sufficient if it identifies the circumstances constituting fraud so that the Defendant can prepare an adequate answer from the allegations. 5 Wright & Miller, *Federal Practice and Procedure:* Civil 2d § 1298 n. 28 (1990). Given the timing of this motion (approximately seven months after the initial Complaint was filed), the parties have already engaged in significant discovery such that Defendants had an opportunity to clarify in discovery any missing elements of the claims which they might have argued were prejudicial to them as pleaded. This Court is satisfied that the fraud claims as pleaded in Plaintiffs' Amended Complaint are sufficient, within the meaning of Rule 9(b), to survive dismissal at this stage of this case.[6]

## II. MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment must be granted if:

---

**6.** Defendants' Memorandum relies heavily on this Court's rulings in *In re One Bancorp Securities Litigation,* 135 F.R.D. 9 (D.Me.1991) and *Philippe v. Shape, Inc.,* 688 F.Supp. 783 (D.Me. 1988) to argue that the Complaint at issue is insufficient under Fed.R.Civ.P. 9(b). However, the facts of those cases are significantly distinguishable from the facts in the case at bar.

In *In re One Bancorp,* 135 F.R.D. at 13, much of the Court's decision to dismiss two counts of the complaint for failure to comply with Fed. R.Civ.P. 9(b) stemmed from the fact that virtually all of plaintiffs' allegations were made on information and belief. In addition, plaintiffs alleged almost no concrete facts in support of its claim that the bank's provision for loan losses and the bank's financial reports were somehow fraudulent. *Id.* at 14.

In the case at bar, all of Plaintiffs' allegations are based on personal knowledge. By alleging that they made Defendant aware of their conservative investment goals and that, despite such knowledge, he guided them towards high-risk investments from 1988–1991, without informing them of the risks, Plaintiffs specifically allege circumstances that, if believed by the factfinder, demonstrate that fraud has been committed.

In *Philippe,* 688 F.Supp. at 786, this Court held that plaintiff pleaded fraud with enough specificity to satisfy Rule 9(b). Plaintiff, a Shape stockholder, brought suit against Shape, Inc. and two of its officers, alleging that by fraudulently misrepresenting material facts in corporate documents, failing to inform plaintiff or seek his approval of the capitalization merger, and refusing to buy back his shares at a statutorily-fixed price, defendants violated federal and state securities law. *Id.* at 784. Given the nature of the case, plaintiff was able to pinpoint specific dates (often through dated filings of articles of incorporation) and events, all of which occurred within a six-month time period. *Id.* at 786.

The Complaint at issue lacks the precise timeline of events pleaded in *Philippe.* However, the case at bar is distinctly different, thus such a precise timeline would be burdensome to construct. In this case, the alleged behavior went on for a long period of time (approximately three years) and involved most security purchases made by Plaintiffs during that time. To expect Plaintiffs to plead the precise details of their various dealings with and purchases through Defendant during this time period in the same fashion as Plaintiffs in *Philippe* would be unrealistic. Further, since Defendants have access to the transaction data of record, there is no impediment to their formulation of the timeline and transaction history that they seek to have Plaintiffs create. *See In re Olympia Brewing Co. Securities Litigation,* 674 F.Supp. 597, 620 (N.D.Ill. 1987) (less specificity required when allegedly fraudulent transactions are numerous and take place over an extended period of time).

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has recently articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limits differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–59 [106 S.Ct. at 2511].

*Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989).

## COUNT I—SECURITIES FRAUD

■ In Count I, Plaintiffs allege a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. The Court of Appeals for the First Circuit has defined the elements of a Rule 10b–5 violation as: (1) material omissions and/or misrepresentations; (2) scienter on the part of defendant[7]; (3) reliance by plaintiff; and (4) due care by the plaintiff. *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978).

■ In its Memorandum in Support of Its Motion for Summary Judgment, Defendants characterize "the gist" of Plaintiffs' allegations as "the Defendants' recommendations were unduly rosy." Defendants' Memorandum in Support of its Motion for Summary Judgment (Docket No. 33) at 12. The Court disagrees with this characterization because it ignores completely the alleged context of Defendants' statements. Plaintiffs' allegations focus on the unsuitable and misleading nature of Defendants' securities recommendations to Plaintiffs *in light of their expressed conservative investment goals*. Thus, Plaintiffs' allegations do much more than claim that Defendants were unduly optimistic about the future of particular companies.[8]

■ A broker's recommendation of unsuitable securities can form the basis for a Rule 10b–5 claim for fraudulent conduct or materi-

---

**7.** The Court of Appeals for the First Circuit has twice assumed without deciding that recklessness is sufficient to show scienter. *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 516 (1st Cir.1978); *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir. 1978).

**8.** The Court notes that a broker's mere puffery and vague allusions to future profitability does not state a claim for securities fraud. *See Xaphes v. Merrill Lynch, Pierce, Fenner & Smith*, 632 F.Supp. 471, 486 (D.Me.1986). In addition, Plaintiffs' status as retirees, living on fixed incomes, does not mean that a broker must infer that they are interested in only low risk investments. *See Lefkowitz*, 804 F.2d 154, 156.

al omissions. *Lefkowitz v. Smith, Barney, Harris Upham & Co.,* 804 F.2d 154, 155 (1st Cir.1986); *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594 (2d Cir.1978); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454 (9th Cir.1986); *Rush v. Oppenheimer & Co.,* 592 F.Supp. 1108 (S.D.N.Y.1984). Although Plaintiffs have alleged each element of a 10b–5 claim, there are genuine issues of material fact that are disputed between the parties, including whether Plaintiffs made it clear to Defendants that they were interested in only conservative investments. Such a factual conflict must be resolved by a factfinder before undertaking any legal analysis herein. Thus, summary judgment will be denied on Count I.

## COUNT IV—FRAUD AND DECEIT

In Count IV, Plaintiffs allege that Defendants contacted Plaintiffs and made false representations to them, such that Plaintiffs were induced to believe that the securities Defendants suggested for them were appropriate for their conservative investment needs.

The Law Court has made clear that a defendant is liable for fraud or deceit if he:

1) makes a false representation

2) of a material fact

3) with knowledge of its falsity or in reckless disregard of whether it is true or false

4) for the purposes of inducing another to act or to refrain from acting in reliance upon it and

5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Letellier v. Small,* 400 A.2d 371, 376 (Me. 1979). The alleged false representations in the case at bar are Defendants' securities suggestions, which he allegedly represented as good investments for the Plaintiffs, yet which, given their alleged conservative investment goals, were unsuitable for them. As in the previous count, there are genuine disputes of material fact that remain; thus, summary judgment will be denied on Count IV.

## COUNT V—VIOLATION OF 32 M.R.S.A. § 10201

In Count V, Plaintiffs state that Defendants' alleged inducement of Plaintiffs to trade in high-risk securities, despite Robert Rice's alleged knowledge that Plaintiffs were seeking conservative investments, violated the Revised Maine Securities Act, 32 M.R.S.A. § 10201 (1964). 32 M.R.S.A. § 10201 provides:

> In connection with the offer, sale, or purchase of any security, a person shall not, directly or indirectly:
>
> 1) employ any device, scheme or artifice to defraud;
>
> 2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> 3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Because of the genuine disputes of material facts that remain, summary judgment will be denied on Count V.

## COUNT VI—UNFAIR TRADE PRACTICES UNDER 5 M.R.S.A. § 205–A

In Count VI, Plaintiffs allege that Defendants' alleged conduct constitutes unfair trade practices under Maine's Unfair Trade Practices Act, 5 M.R.S.A. §§ 205–A – 214 (1964). The Law Court has never ruled on the question of whether securities transactions are covered under the Unfair Trade Practices Act. This Court will now examine that question of law.

Under section 207 of the Act, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." Section 206(3) states that:

> 'trade' and 'commerce' shall include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or

thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State.

In addition, section 207(1) encourages Maine courts to look to the federal courts' interpretation of the Federal Trade Commission Act for guidance when interpreting the state statute.[9] No federal court decision, of which this Court is aware, has applied section 5(a)(1) of the Federal Trade Commission Act to securities transactions.

This Court begins its analysis with the language of the statute. Maine's Unfair Trade Practices Act provides one explicit exception to its coverage. 5 M.R.S.A. § 208(1) provides:

Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the State or of the United States.

Although Defendants have failed to so argue, this Court will examine, *sua sponte*, whether this exception exempts securities transactions from the Unfair Trade Practices Act, given the federal and state regulation of securities in Maine.

While the Law Court has never addressed this issue, it has examined the application of section 208(1) to other regulated activities. In *First of Maine Commodities v. Dube*, 534 A.2d 1298 (Me.1987), the Law Court held that, because by statute the Maine Real Estate Commission extensively regulates brokers' activities, such activities are exempted under section 208(1) and thus fall outside the scope of Maine's Unfair Trade Practices Act. *Id.* at 1302. In *Dube*, plaintiff, a real estate broker, argued that by failing to include a

full statement of the consumer's right to avoid a contract for the sale of merchandise, defendant vendors violated the Maine Solicitation Sales Act, 32 M.R.S.A. §§ 4661–4670 (1964). Since any violation of that Act constitutes a violation of Maine's Unfair Trade Practices Act, plaintiff sought equitable relief under the Unfair Trade Practices Act. *Id.* at 1301. Because brokers' activities generally, and the execution of exclusive listing agreements specifically, are regulated by the state, the court held that section 208(1) exempted the brokers' activities from coverage under the Unfair Trade Practices Act.

Other states with similar exemptions in their unfair trade practices acts have held that such exemptions exclude securities transactions from coverage.[10] For example, in *State of Rhode Island v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978), Rhode Island's Supreme Court directly addressed the issue whether a cause of action arising from actions or transactions regulated by and permitted under the laws administered by the United States Securities Commission could be brought under the state's unfair trade practices act, given that act's regulatory exemption.[11] The Court wrote that "giving the language of section 6–13.1–4 its plain meaning, we conclude that the Legislature clearly exempted from the Act all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or offices." *Id.*, 382 A.2d at 822. The Rhode Island Supreme Court went on to note that the sale of securities within the state of Rhode Island is permitted only when conducted in accordance with certain state regulations, just as the sale of securities in interstate commerce is permitted only under the rules and regulations promulgated pursu-

---

9. Section 207(1) provides:
   It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
   5 M.R.S.A. § 207(1) (1964).

10. *See, Kittilson v. Ford, et al.*, 23 Wash.App. 402, 595 P.2d 944 (1979), *aff'd*, 93 Wash.2d 223, 608 P.2d 264 (1980); *State ex rel. McLeod v. Rhoades*, 275 S.C. 104, 267 S.E.2d 539 (1980).

11. Rhode Island's Deceptive Trade Practices Act's exemption provision is almost identical to Maine's and provides in pertinent part:
   Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States.
   R.I.G.L.1956 (1969 Reenactment) Section 6–13.1–4.

ant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1970) which is administered by the Securities and Exchange Commission. *Id.* at 822. Finally, the court concluded, "because the conduct at issue was clearly subject to the control of government agencies on both the state and federal level, it is within the exemption provision and not subject to the mandates of the [Unfair Trade Practices] Act." *Id.*

Applying the parallel exemption from its Unfair Practices Act, New Mexico's Court of Appeals engaged in a comparable analysis in *State ex rel. Stratton v. Gurley Motor Co.,* 105 N.M. 803, 737 P.2d 1180 (App.1987).[12] However, the New Mexico court explicitly narrowed the exemption's application, writing:

> We construe the language "permitted under laws administered by a regulatory body" in Section 57–12–7 to require more than the mere existence of a regulatory body in order for the exemption to apply. At a minimum, the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption, thereby exercising at least the modicum of oversight that the exempting language indicates is required. In effect, this means the regulatory body must render permission to engage in the business of the transaction through licensing, registration, or some similar manifestation of "permitting" the business activity. Until the party complies with the requisite licensing or registration procedure, the regulatory body cannot be deemed to have authorized, or implicitly permitted, any transactions in the area subject to regulation.

*Id.*, 737 P.2d at 1184. Thus, because the defendant at issue was not a licensed insurance agent or broker at the time of his actions, his activities were not authorized transactions permitted under the insurance laws of the state. *Id.* at 1185. Therefore, the court ruled that the defendant's actions were *not* exempted from coverage by the Unfair Trade Practices Act.

Given the Law Court's analysis in *Dube* and other courts' interpretations of the regulatory exemption in the securities context, this Court is convinced that Maine's regulatory exception, 32 M.R.S.A. § 208(1), operates to specifically exempt securities transactions from coverage under Maine's Unfair Practices Act. Plaintiffs, in their Amended Complaint concede that Defendants were engaged in the business of selling securities.[13] In Maine, the sale of securities must be licensed and is permitted only under the authority of the Revised Maine Securities Act, 32 M.R.S.A. §§ 10301–10314 (1964). The sale of securities in interstate commerce is permitted only under the rules and regulations promulgated pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* Thus, in the case at bar, the conduct at issue was clearly subject to licensure, was, in fact, licensed, and is clearly subject to both federal and state regulation. As such, it falls within the exemption provision of Maine's Unfair Trade Practices Act. .Therefore, despite genuine issues of material fact, Defendants' Motion for Summary Judgment will be granted as to Count VI because, as a matter of law, the Maine Unfair Practices Act does not apply to securities transactions.[14]

---

12. Section 57–12–7 of New Mexico's Unfair Practices Act provides in part:
Nothing in the Unfair Practices Act ... shall apply to actions or transactions permitted under laws administered by a regulatory body of the state of New Mexico or the United States. N.M.S.A. Section 57–12–7 (1978).

13. *See* Amended Complaint (Docket No. 20), ¶¶ 5 and 6. This Court takes as true those facts admitted in the pleadings.

14. The Court must note its frustration with the parties' briefing, or lack thereof, on this issue. Both parties neglected to examine the exemption's possible application in the case at bar. Instead, they briefed the issue of whether the

language of section 207 delineating "unlawful acts and conduct" applied to securities transactions. Having reviewed the case law cited by the parties on this issue and more, the Court finds it likely, without here deciding, that, *even if the exemption did not apply,* Maine's Unfair Trade Practices Act would still not cover securities transactions.

The majority of jurisdictions that have confronted the question whether their unfair trade practices act applies to securities transactions have held that securities transactions are *not* covered under the state's unfair trade practices act. *See, e.g., Spinner Corp. v. Princeville Development Corp.,* 849 F.2d 388, 393 (9th Cir.1988) (applying Hawaii law); *Stephenson v. Paine, Web-*

### III. MOTION FOR AN ATTACHMENT/TRUSTEE PROCESS

Pursuant to Maine Rules of Civil Procedure 4A and 4B and Local Rule 14, Plaintiffs have made a Motion for Attachment and Trustee Process against Defendants' property in the amount of $520,108.[15] In support of its motion, Plaintiffs submitted affidavits from Ernest Wyman (Docket No. 28), Wilma Wyman (Docket No. 29) and Plaintiffs' securities expert, Stephen Sussman (Docket No. 30).

Maine Rule of Civil Procedure 4A(c) provides:

> [Attachment] may be entered only after notice to the defendant and hearing and upon a finding by the court that it is *more likely than not* that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the aggregate sum of the attachment and any liability insurance, bond, or other security, and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment.

(emphasis added). Previously, plaintiffs needed to show a "reasonable likelihood of success" in order for the Court to grant attachment. The rules governing attachment and attachment on trustee process were amended effective February 15, 1992, to change the "reasonable likelihood of success" standard to a "more likely than not" standard. M.R.Civ.P. 4A Advisory Committee's Note to 1992 Amend., Me.Rptr., 604 A.2d No. 2 CXLII–CXLIV. The Law Court has not yet applied this new standard in a written opinion.

This Court looks to the Advisory Committee's Notes to Amendment of M.R.Civ.P. 4A for guidance in applying this new standard. The notes explain that "the change in the standard for attachment responds to prevailing concerns that attachments are too freely given under the [reasonable likelihood of success] standard" and that "the purpose of the increased standard is to strike a more even balance between plaintiff and defendant in the use of attachment." *Id.* at CXLII. Further, the Advisory Committee elaborates that under the new standard, "a moving party must show a greater than 50% chance of prevailing" on both liability and damage issues. *Id.* at CXLIII. The type of evidence to be submitted will be the same as under

---

ber, *Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir.1988) (applying Louisiana law); *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 510 A.2d 972, 977 (1986) (applying Connecticut law); *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167–68 (4th Cir.1985) (applying North Carolina law); *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985) (applying Massachusetts law); *In re Catanella & E.F. Hutton & Co., Securities Litigation*, 583 F.Supp. 1388, 1443 (E.D.Pa.1984) (applying New Jersey law); *Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667, 673–75 (N.D.Ga.1983) (applying Georgia law); *Swenson v. Engelstad*, 626 F.2d 421, 427–428 (5th Cir. 1980) (applying Texas law). *But see Denison v. Kelly*, 759 F.Supp. 199 (M.D.Pa.1991); *State of Arizona, ex rel. v. Pickrell*, 136 Ariz. 589, 667 P.2d 1304 (1983) (holding that legislature intended consumer fraud act to provide relief for securities act violations in light of legislative amendment stating that remedies under that consumer fraud act were "in addition to" all other remedies available in the state). The reasoning behind these decisions vary greatly, depending on the language of the statutes, the expressed legislative intent, and the concerns of the court.

In an effort to persuade this Court to rule in its favor, Plaintiffs cite two Massachusetts cases (from 1983 and 1984) for the proposition that "the District Court in Massachusetts has twice held that a Massachusetts statute proscribing unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce is applicable to securities transactions." Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 42) at 19. However, in 1985, the Supreme Judicial Court, responding to a certified question from the United States District Court, wrote that the Massachusetts unfair trade practices statute (Chapter 93A of the Massachusetts General Laws) does *not* apply to conduct alleged to violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 promulgated thereunder. *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985). In light of the ruling in *Cabot Corp.*, Plaintiffs' argument and citing of earlier Massachusetts case law is, *at best*, highly misleading.

15. The property that Plaintiffs seek to attach is:

(1) real estate owned by Robert Rice at 5 Roundabout Lane, Cape Elizabeth, Maine;
(2) account(s) at Fleet Bank;
(3) account(s) at First Maine Bank; and
(4) and account(s) at Government Credit Union.

*See* Plaintiffs' Motion for Approval of Attachment and Trustee Process (Docket No. 26) at 1.

existing law. The required showing is to be made through affidavits; there is no right to an evidentiary hearing. *Id.; Atlantic Heating Company v. Lavin*, 572 A.2d 478 (Me. 1990). Specificity is required in the showing for the amount of the attachment. 604 A.2d at CXLIII.

This Court is not convinced that it is more likely than not that Plaintiffs will recover in the amount of $520,108.[16] The liability issues largely hinge on issues of credibility and on how Plaintiffs communicated their investment goals to Defendants. While Plaintiffs' affidavits state that they told Robert Rice from the beginning that they were interested in conservative, dividend generating investments to supplement their retirement income, at his deposition, Ernest Wyman testified that he did not *tell* Rice that he wanted only conservative investments, but rather, that his orders lead Rice to believe that. *See* Affidavit of Ernest Wyman (Docket No. 46), ¶ 3; Affidavit of Wilma Wyman (Docket No. 45), ¶ 4; and Deposition of Ernest Wyman at 21. Given the affidavits and deposition testimony submitted, it is unclear exactly how Plaintiffs communicated their conservative investment goals to Defendants; thus, this Court cannot find that it is more likely than not that Defendants are liable to Plaintiffs.

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 9(b) be, and it is hereby, DENIED. It is further ORDERED that Defendants' Motion for Partial Summary Judgment be, and it is hereby, GRANTED as to Count VI, and DENIED as to Counts I, IV, and V. Finally, it is ORDERED that Plaintiffs' Motion for Attachment/Trustee Process be, and it is hereby, DENIED.

So ORDERED.

---

16. Plaintiffs arrive at such a figure by calculating how much Plaintiffs would have today if the amounts that Plaintiffs had at the end of 1988 had been invested in a conservative growth fund consistent with the Wymans' alleged investment objectives. Plaintiffs' Memorandum in Support of its Motion for Attachment (Docket No. 27) at 12.